FILED

2006 Oct-11  PM 05:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **CINDY GIBBS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:06-CV-1657-RDP** |
| | } | |
| **BELLSOUTH** | } | |
| **TELECOMMUNICATIONS, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

### I.      Introduction

Currently pending before the court is Plaintiff's Motion for Preliminary Injunction.  (Doc. #

5).[1]  The court ordered briefing as to the motion for preliminary injunction and set a hearing date.

The court held an evidentiary hearing on October 5, 2006, and the parties have fully briefed the

motion.  Accordingly, the motion is ripe for decision.  For the reasons discussed below, the court

finds that Plaintiff's Motion for Preliminary Injunction is due to be denied.

### II.     Statement of Facts

Cindy Gibbs ("Plaintiff") was hired by BellSouth Telecommunications, Inc. ("Defendant"

or "BST") on October 9, 2000 as a Service Representative in Birmingham, Alabama. (Doc. # 9 ¶ 20).

"Service Representative" is a sedentary job primarily consisting of sitting and talking on the

telephone to assist customers.  (Doc. # 9 ¶ 21).  As a Service Representative, the terms and

conditions of Plaintiff's employment were governed by a Collective Bargaining Agreement ("CBA")

---

[1]By agreement of the parties and pursuant to a discussion during the hearing on the motion
for preliminary injunction, Plaintiff's Motion for Temporary Restraining Order (Doc. # 4) was
deemed moot.

between Plaintiff's union, the Communications Workers of America ("CWA"), and BST. (Doc. # 9 ¶ 22).

The BellSouth Short Term Disability Plan ("STD Plan") is a welfare benefit plan governed by ERISA, 29 U.S.C. § 1140. The STD Plan is offered to eligible employees of BST, and is designed to provide payments to an employee when she cannot work because of a disability resulting from an illness or accidental injury. (Doc. # 9 ¶ 23). Under the STD Plan, "disability" is defined as:

> [A] medical condition which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement. "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. "A Participating Company job" is any job within a Participating Company or any job outside a Participating Company, which is comparable in skills and functions. . . . A Participant subject to a Disability is referred to as being "Disabled."

(Doc. # 9 ¶ 24; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 6 at 2). An employee must meet the definition of "disability" in order to be eligible for disability payments under the STD Plan. (Doc. # 9 ¶ 25; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 6 at 3). The STD Plan provides for paid leave as determined by the employee's "net credited service" time, which is calculated according to the time that the employee has been with the company, and supplements this with unpaid leave for the remainder of the fifty-two week plan limit. (Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 5 at 3–4). When Plaintiff was first applying for benefits under the STD Plan, Broadspire Services, Inc. ("Broadspire") was the third-party administrator of the STD Plan. (Doc. # 9 ¶ 26). Aetna purchased the disability operations of Broadspire on or about April 1, 2006 and has been the third-party administrator of the STD Plan since that date. (Doc. # 9 ¶ 27).

2

If an eligible employee is disabled at the end of the fifty-two weeks of leave available through the STD Plan, the Long Term Disability Plan ("LTD Plan") covers the employee, providing her with one-half base pay less any Social Security benefits, and also provides her with the same fringe benefits (including health insurance) that retired employees receive. (Doc. # 9 ¶¶ 14–15; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 5 at 3–4). The LTD Plan requires that the participant not work at a job paying more than one-half her pre-disability wage in order for the employee to receive full coverage under the plan. (Doc. # 9 ¶ 16; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 5 at 3–4). Furthermore, the LTD Plan provides that in order to remain eligible to receive benefits, disabled participants in the plan must take proper care of themselves and obtain appropriate professional treatment, and that benefits can be discontinued if a participant refuses to submit to a medical examination requested by Broadspire. (Doc. # 9 ¶ 18a; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 5 at 6–7).

Effective September 1, 2002, as a result of continuous bargaining, the CWA and BellSouth created the Short Term Disability Appeal Leave of Absence Program for Non-Salaried Employees (the "STD Appeal Leave Program" or "Program"). (Doc. # 9 ¶ 28; Doc. # 9 Ex. 1). The creation of the STD Appeal Leave Program is documented in a Memorandum of Agreement between the CWA and BellSouth. (Doc. # 9 ¶ 29; Doc. # 9 Ex. 1 ). The Program provides a means for eligible non-management employees to take an unpaid leave of absence with return rights, and it is designed to allow employees who have been denied STD benefits to take a leave for the period of time necessary to reach a final administrative decision regarding an appeal of the denial of STD benefits. (Doc. # 9 ¶ 30; Doc. # 9 Ex. 1 at 4). The Program provides that if "an employee does not apply for reinstatement to his or her department (verbally or written) within 10 calendar days from the

3

termination of the leave due to any of the above stated reasons [first or second appeal denied, returns to work, begins work for another company], the employee will be terminated from the payroll and will have no right of reinstatement and no right to severance pay provided under the Working Agreement." (Doc. # 9 Ex. 1 at 9).

On or about January 24, 2005 Plaintiff's supervisor reported to Broadspire that she had been absent from work since January 17, 2005. (Doc. # 9 ¶ 1). Thus, Plaintiff's first day absent from work under a pending claim for STD Plan benefits, styled STD Case #1439801 by Broadspire, was January 17, 2005. (Doc. # 9 ¶ 32). Although Plaintiff failed to apply for appeal leave through the Program, she was nonetheless treated as being on such leave, including allowing her to continue her employment with all benefits (except pay) while she was pursuing her administrative appeals. (Doc. # 9 ¶ 33). Plaintiff claims that several disabling conditions have prevented her from working, including insomnia, chronic headaches, fibromyalgia, chronic pain, depression, chronic fatigue syndrome, and degenerative joint disease, as evidenced by symptoms such as lower back pain, neck pain, headaches and depression. (Doc. # 9 ¶¶ 3–4; Oct. 5, 2006 Evidentiary Hearing, Plaintiff's Ex. # 4 at 1–3). Since her waiting period under the STD Plan had elapsed, her absence due to an alleged disability initiated the claims process in which Broadspire would determine if Plaintiff was qualified for benefits under the STD Plan. (Doc. # 9 ¶¶ 1–2). The parties differ as to whether sufficient evidence of disability was submitted, with Plaintiff asserting that she has submitted more than enough evidence to substantiate her disability claim and Defendant asserting that she has not. (Doc. #9 ¶ 5).

On January 31, 2005, Plaintiff sent a letter to Broadspire requesting that she not be contacted by its employees because she considered any contact from them to be harassment. (Doc. #9 ¶ 34;

Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 1).  Plaintiff's supervisor was notified of the benefits denial by a letter dated February 7, 2005.  (Doc. #9 ¶ 36).  Thereafter, Broadspire received medical records from Plaintiff.  (Doc. # 9 ¶ 37).  On February 24, 2005, Broadspire sent a letter to Plaintiff notifying her that medical records had been received pertaining to her claim, that no formal appeal had been filed, and that, unless a formal appeal was requested, Broadspire would not review the documentation.  (Doc. # 9 ¶ 37).  Plaintiff's attorney, who at the time was John Pennington, sent a letter dated February 25, 2005 to Broadspire appealing the denial of benefits, requesting copies of the documents relied upon in reaching the denial decision, and asking that the appeal be placed on hold for sixty days to give him an opportunity to present medical information.  (Doc. # 9 ¶ 38).  Broadspire sent a letter dated March 2, 2005 to Pennington confirming receipt of the first level appeal and agreeing to give Plaintiff until May 3, 2005 to submit additional medical information.  (Doc. # 9 ¶ 39).  On March 4, 2005, Broadspire sent Pennington copies of all file materials and notes for Plaintiff's claim under the STD Plan and the requested plan documents.  (Doc. # 9 ¶ 40).

On May 6, 2005, Broadspire sent a letter to Pennington agreeing to allow additional time for submission of medical records beyond the May 3 deadline.  (Doc. # 9 ¶ 41).  On June 9, 2005, Pennington requested another extension to submit medical records to Broadspire and it was granted.  (Doc. # 9 ¶ 42).  Broadspire sent a letter dated July 13, 2005 to Pennington notifying him that the appeal would continue to be on hold to await receipt of information from Plaintiff.  (Doc. # 9 ¶ 43).  On September 12, 2005, Broadspire sent a letter to Pennington granting his request for additional time to submit medical information.  (Doc. # 9 ¶ 44).  Pennington forwarded medical records to Broadspire on October 10, 2005.  (Doc. # 9 ¶ 45).  On November 22, 2005, Kenneth Lee Cleveland, Plaintiff's current attorney, sent a letter to Broadspire requesting an additional sixty days to provide

information regarding Plaintiff's appeal.  (Doc. # 9 ¶ 46).

A letter denying Plaintiff's first level appeal from the initial decision denying benefits was sent to Pennington on November 28, 2005, and Cleveland was also notified on this date.  (Doc. # 9 ¶¶ 47, 49).  Plaintiff's supervisor was notified of the denial decision by letter dated November 28, 2005.  (Doc. # 9 ¶ 48).  Plaintiff requested a second level appeal of the denial through a letter dated January 13, 2006 from Cleveland.  (Doc. # 9 ¶ 50).  Pursuant to Cleveland's request, and by a letter dated February 7, 2006, Broadspire allowed Plaintiff additional time to submit medical information. (Doc. # 9 ¶ 51).  On February 28, 2006, Broadspire forwarded a copy of all file materials in Plaintiff's STD claim case file to Cleveland pursuant to his request.  (Doc. # 9 ¶ 52).

On May 4, 2006, the Social Security Administration ("SSA") determined that Cindy Gibbs was disabled as of January 22, 2005 and, therefore, eligible for disability benefits from that date. (Doc. # 9 ¶ 6; Oct. 5, 2006 Evidentiary Hearing, Plaintiff's Ex. # 4 at 23–31).  A copy of this order was sent to Broadspire for its review in connection with Plaintiff's claim under the STD Plan.  (Doc. # 9 ¶ 6).  During the evidentiary hearing, Plaintiff testified that she received $1,004 per month from the SSA as a disability benefit.  (Oct. 5, 2006 Evidentiary Hearing, Transcript at 8).  She also testified that the lump sum payment she had received from SSA was completely exhausted by outstanding debts and previous obligations.  (Oct. 5, 2006 Evidentiary Hearing, Transcript at 34).

Pursuant to correspondence dated May 18, 2006, Cleveland agreed to place the appeal on hold in order for Broadspire to arrange to have a peer consultant contact and speak with Plaintiff's primary physician.  (Doc. # 9 ¶ 53).  A letter denying Plaintiff's second level appeal was sent to Cleveland on July 21, 2006.  (Doc. # 9 ¶ 54; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 2).  This letter upheld the original decision to deny benefits effective January 24, 2005, confirmed

6

that Plaintiff had exhausted all mandatory appeal procedures under the STD Plan, and stated that she could bring a civil action under ERISA.  (Doc. # 9 ¶¶ 7–8, 54–55; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 2).

On August 11, 2006, Plaintiff's supervisor Rhonda B. Dorsey mailed a letter to Plaintiff, which advised her that she had exhausted all mandatory appeal procedures under BST's STD Plan. (Doc. # 9 ¶ 56; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 3).  The letter further informed Plaintiff : "[Y]ou must return to work no later than Monday, Aug. 21st, 2006 at 9:00 a.m.  If you do not return to work on Aug. 21, 2006 your employment with BellSouth will be terminated effective Tuesday, Aug. 22nd, 2006 for failure to report." (Doc. # 9 ¶ 56; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 3).  The letter also stated:  "Please contact me at telephone number 205-714-0307 to discuss your employment status." (Doc. # 9 ¶ 57; Oct. 5, 2006 Evidentiary Hearing, Defendant's Ex. # 3).  Plaintiff did not return to work on Monday, August 21, 2006, nor did she ever call Ms. Dorsey.  (Doc. # 9 ¶ 58).  Plaintiff contends that returning to her duties at her job with Defendant would make her ineligible for prospective LTD Plan benefits.  (Doc. # 9 ¶ 17).

Plaintiff turned Dorsey's August 11, 2006 letter over to her lawyer, Cleveland.  In turn, Cleveland faxed a letter to Defendant's Legal Department on August 21, 2006, stating that he intended to file suit under ERISA § 502 for wrongful denial of benefits under the plan.  29 U.S.C. § 1140.  (Doc. # 9 ¶ 59).  On August 22, 2006, Defendant terminated Plaintiff's employment, making her no longer eligible for company-provided health insurance and benefits, including participation in the LTD Plan.  (Doc. # 9 ¶ 12).  That same day, Plaintiff filed suit for her benefits under the STD Plan and the LTD Plan.  (Doc. # 9 ¶¶ 11, 61).  Dorsey received a letter from Cleveland on August 23, 2006, stating that Plaintiff intended to file a lawsuit challenging the denial of her claim for STD

7

Plan benefits. (Doc. # 9 ¶ 62). Plaintiff filed an amended complaint on September 15, 2006 alleging that the termination of her employment unlawfully interfered with her claim for ERISA regulated benefits–in effect a retaliation claim under § 510. 29 U.S.C. § 1140. (Doc. # 9 ¶¶ 13, 63).

After her termination, Plaintiff was informed that she could continue health insurance coverage at her expense and that her monthly payments under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") would be $ 322.32 for medical insurance. (Doc. # 9 ¶ 63). Although Plaintiff testified at the hearing on October 5, 2006, that she was previously unaware she could continue her health insurance under COBRA, she admitted that, since she is now aware of this option, she "does not know" whether or not she could afford such coverage. (Oct. 5, 2006 Evidentiary Hearing, Transcript at 19–20). Additionally, she admitted that this coverage would lower her estimated $500/month for medications and would cover some doctor's bills. (Oct. 5, 2006 Evidentiary Hearing, Transcript at 14–15).

## III.    Standard of Review

A district court may grant a preliminary injunction if the movant, here Plaintiff, can show the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.

1998).  The parties have agreed that only the first and second prongs of this test are in dispute here.

## IV.    Discussion

In order to show substantial likelihood of success on the merits, Plaintiff must show that she is likely to prevail on her underlying ERISA retaliation claim, arising under § 510, 29 U.S.C. § 1140.[2] Section 510 of ERISA makes it:

> [U]nlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled *under the provisions of an employee benefit plan*, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled *under the plan*.[3]

29 U.S.C. § 1140 (emphasis added).  In short, an employer may not retaliate or interfere with an employee's attempts to exercise her rights under the relevant plan.  Plaintiff claims that by terminating her employment, Defendant has interfered with her claim for benefits under the STD and LTD Plans, since she cannot develop a medical record of her disability without the health insurance

---

[2]The court notes the inherent interconnection between Plaintiff's § 502 claims for wrongful denial of benefits and her claim for retaliation under § 510 of ERISA.  However, the parties have agreed that Plaintiff's substantial likelihood of success on her underlying claim for the purposes of ruling on this Motion for Preliminary Injunction should be analyzed only under § 510.  Because of the intense factual analysis inherent in reviewing the ERISA plan administrator's decision under § 502, and as the court has not had the benefit of reviewing the entire administrative record of Plaintiff's claims, it would be inappropriate for the court to substitute its judgment for that of the plan administrator at this time.

Additionally, the court finds it would be improper to grant the Plaintiff's Motion for a Preliminary Injunction even if it ventured to review the plan administrator's determination under § 502.  The record simply does not permit the court to determine what standard of review applies here, nor does it reveal any bad faith or conflict of interest.

[3]The statute's use of the word "plan" refers to the relevant benefit plan covered by ERISA in place at the particular company.  *Godfrey*, 89 F.3d at 759 n. 1.  Here, the court has reviewed Defendant's Short Term Disability Plan, Long Term Disability Plan, and Short Term Disability Appeal Leave of Absence Program. (Oct. 5, 2006 Evidentiary Hearing, Defendant's Exs. # 4–5; Doc. #9 Ex. 1).

benefits afforded only to Defendant's employees.   (Doc. # 3 ¶¶ 5–6).

At first blush, there does not appear to be any evidence of retaliation or interference which would violate § 510.  The parties agree that Broadspire was an independent, third-party administrator of Defendant's STD and LTD Plans.  (Doc. # 9 ¶ 26).  Plaintiff has suggested there was collusion between Broadspire's employees and Defendant's employees that resulted in Broadspire denying her STD claim and, therefore, saving Defendant the costs of insuring her under the plan.  (Oct. 5, 2006 Evidentiary Hearing, Plaintiff's Exs. # 2–3).  However, the records showing communications between Broadspire employees and Defendant's employees, including Plaintiff's direct supervisor, as well as notes made by Broadspire's employees regarding Plaintiff's claim, fail to prove collusion or even to suggest a suspect motive on the part of the Defendant, which is required to show retaliation under § 510 of ERISA.  29 U.S.C. § 1140.  Without engaging in undue speculation, the court cannot conclude that the telephone calls between Broadspire and Defendant reveal anything more than objective information regarding Plaintiff's claim and pending appeal.[4]

---

[4]The court notes that the only part of the record that even hints at any questionable communication between Broadspire and BST is a "late entry" in Broadspire's agent's case notes made on September 7, 2005:

> 9/6:  Pamela Pass, Operations Director and John Mask, Supervisor, contacted SNR on 9/6 to advise that claimant was now hospitalized.  **This claimant is escalating this case.**  SNR advised will contact claimant to confirm hospitalization.  If [it] is confirmed, [Broadspire] will most likely have benefits auth[orize]d [for claimant] for date of hospitalization.  SNR will contact Mr. Mask when P2020 completed. -BK

Oct. 5, 2006 Evidentiary Hearing, Plaintiff's Ex. # 3 at 6 (emphasis added).  That entry, in and of itself, is not sufficient at this time to allow Plaintiff to meet her high burden on this motion.  Further discovery may aid in determining whether or not it is a fact that affects the ultimate determination in this case. Apart from this entry, there is little in the records to suggest the content of any of these conversations, other than the objective facts exchanged between Broadspire employees and Defendant's employees regarding Plaintiff's case.  Thus, on the record before it, the court finds there is insufficient evidence compelling a review of the decision in this case under any standard other

Moreover, Plaintiff claims that Defendant required her to return to work so that she would no longer qualify for benefits under the STD Plan, and, therefore, would not be entitled to benefits under the LTD Plan.  (Doc. # 3 ¶ 7).  Plaintiff further alleges that Defendant discharged her for seeking to exercise her rights under these benefit plans.  (Doc. # 3 ¶ 4).  A review of the record developed at this early stage of the litigation suggests that Defendant has, in good faith, complied with the terms of its STD Appeal Leave Program (which is an integral part of the STD and LTD Plans) in terminating Plaintiff's employment, and thus cannot now be found liable under ERISA § 510.  Therefore, the court finds Plaintiff has not shown that there is a substantial likelihood of success on the merits of her claim, and her application for a preliminary injunction must be denied.

As noted above,  Defendant's STD Appeal Leave Program became effective September 1, 2002, as a result of continuous bargaining between Plaintiff's union, the CWA, and BST.  (Doc. # 9 ¶ 28; Doc. # 9 Ex. 1).  Its creation is documented in a Memorandum of Agreement between the CWA and BellSouth, and a copy of this is provided to each BellSouth employee. (Doc. # 9 ¶ 29; Doc. # 9 Ex. 1 ).  The Program is designed to allow employees who have been denied STD benefits to take leave for the period of time necessary to reach a final administrative decision regarding an appeal of the denial of STD benefits, while allowing them to maintain their employment status and benefits provided by Defendant.  (Doc. # 9 ¶ 30; Doc. # 9 Ex. 1 at 4).  The Program provides in relevant part:

The STD Appeal Leave will terminate on the earliest of:

. . . .

2. . . . [I]f the employee has requested an extension of the leave pending a second

---

than the deferential arbitrary and capricious standard.

formal appeal, the date of the notification letter sent by the STD administrator to the employee advising of the final decision on the second formal appeal regarding his or her claim for STD benefits.

. . . .

If the employee does not apply for reinstatement to his or her department (verbally or written) within 10 calendar days from the termination of the leave due to any of the above stated reasons [first or second appeal denied, returns to work, begins work for another company], the employee will be terminated from the payroll and will have no right of reinstatement and no right to severance pay provided under the Working Agreement.

(Doc. # 9 Ex. 1 at 9).   Although Plaintiff failed to formally apply for appeal leave, she was nonetheless treated as being on such leave.  (Doc. # 9 ¶ 33).  This resulted in her being permitted to continue her employment with all benefits (except pay) while she was pursuing her administrative appeals.  (Doc. # 9 ¶ 33).

As noted above, both parties agree that the Program is a valid part of the bargained agreement between BellSouth and its unionized employees, it is applicable to Plaintiff, and Plaintiff received benefits under the Program.  After reviewing the Program's terms and the testimony in this case, the court concludes, for purposes of ruling on Plaintiff's motion, that Defendant followed the mandate of the Program regarding Plaintiff's termination.  After Broadspire made its final determination to deny Plaintiff's claim under the STD Plan,[5] Defendant followed its collectively-bargained policy by sending Plaintiff a letter that she would be terminated in ten days if she did not return to work.  (Doc. # 9 ¶ 56).  Plaintiff did not apply for reinstatement to her position, nor did she return to work outright.  (Doc. # 9 ¶ 58).  Therefore, Defendant was acting within its rights under the negotiated

_____

[5]Again, the court notes that the parties have not submitted the complete administrative record of the decision made in this case.

12

STD Appeal Leave program when it terminated Plaintiff's employment.  Based upon the limited

record before the court, it cannot conclude that these actions support a claim of retaliation under §

510.

Further, the limited record evidence before the court related to the circumstances surrounding

her termination does not show that BellSouth interfered with Plaintiff's rights under the STD and

LTD plans.  To support her arguments to the contrary, Plaintiff refers the court to a series of cases

decided in this district and three Eleventh Circuit cases.  (Doc. # 6, Exs. 2–5).  With the exception

of one of these cases, each occurred before the Program was instituted in 2002, and, therefore, those

decisions are inapposite to the case at hand since the court was not analyzing the claim in light of

this new collectively-bargained procedure.  The only case filed after the institution of the Program,

*Bazemore v. BellSouth Telecomm., Inc.*, Case No. CV-03-J-1477-S (N.D. Ala., September 15, 2006),

is also inapplicable here.  The plaintiff in *Bazemore* was already receiving benefits under the STD

Plan when he was terminated for alleged misconduct at the workplace.  The *Bazemore* court

concluded, after a thorough review of a more complete record than that currently possessed by this

court, that the defendant had interfered with the plaintiff's rights and benefits under the STD Plan.

Since the plaintiff was already receiving benefits under the STD Plan, the court specifically found

that the defendant terminated his employment in order to avoid paying further disability benefits.

In the present case, however, Plaintiff *never has received* any benefits under the STD Plan, was

permitted to receive short term leave under the Program, and the court has already noted its inability

to conclusively determine if she should have received any benefits under ERISA § 502.  Based upon

the limited evidence before the court, it must conclude that Plaintiff has been unable to demonstrate

suspect motive or bad faith on the part of Defendant required by § 510.[6]   *Godfrey v. BellSouth Telecomm., Inc.*, 89 F.3d 755, 759 (11th Cir. 1996).

Finally, Plaintiff directs the court to the above-cited *Godfrey* case to support its interpretation of the facts–that Defendant (or Broadspire) acted in bad faith, and thus possessed the requisite motive to violate § 510.  However,  the *Godfrey* court stated: "[A]n employer may demand that an employee return to work after determining that the employee is not disabled, and then discipline that employee for unexcused absences. The employer does not violate ERISA Section 510 just because a court *later* determines that the employer's good faith disability determination was wrong." *Id.* at 759 (emphasis added).  The court finds this to be the case here.  After it was determined that Plaintiff was not disabled under the STD Plan's definition, Defendant, acting in compliance with the Program, directed that she return to work.  When she failed to do so, she was terminated pursuant to the STD Appeal Leave Program.  Although the court may later determine that Broadspire's decision was wrong on a *de novo* review, it cannot conclude from the evidence in this record that (1) Broadspire's decision was made in bad faith or in collusion with Defendant, or (2) that Defendant otherwise retaliated against Plaintiff or interfered with her attainment of any ERISA right.  In light of this, the

---

[6]For the reasons noted above, Plaintiff's submission of the records of conversations between Broadspire's employees and Defendant's employees regarding the progression of Plaintiff's claims fails to demonstrate any collusion or bad faith on the part of Defendant.  Under the arbitrary and capricious standard of review, then, Broadspire's final decision denying benefits, and Defendant's termination of Plaintiff that occurred as a result, need only be reasonable and made in good faith to withstand a charge alleging a § 510 violation.  *Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1564 (11th Cir. 1990).

court is forced to conclude that Plaintiff has failed to show a substantial likelihood of success on the merits of her § 510 claim.[7]   Therefore, a preliminary injunction cannot issue.

### V.      Conclusion

For the reasons explained above, Plaintiff's Motion for Preliminary Injunction (Doc. # 5) is due to be denied.  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____11th_____ day of October, 2006.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[7]Since Plaintiff has failed to show a substantial likelihood of success on the merits of her underlying § 510 ERISA claim, the court need not address the issue of irreparable harm to Plaintiff. However, the court notes that issue would have been a much closer call based upon the evidence presented at the October 5, 2006 evidentiary hearing.