# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **CINDY GIBBS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:06-CV-1657-RDP** |
| | } | |
| **BELLSOUTH** | } | |
| **TELECOMMUNICATIONS, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pending before the court are Plaintiff's Motion for Summary Judgment (Doc. # 23), which was filed on May 23, 2007, and Defendant's Motion for Summary Judgment (Doc. # 28), which was filed on June 13, 2007.  The motions were under submission, without oral argument, as of June 28, 2007.

Plaintiff Cindy Gibbs filed this action on August 22, 2006, alleging that she "is entitled to Short Term Disability Plan benefits and Long Term Disability Plan benefits" governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (hereafter "ERISA"). (Doc. # 1).  Her complaint was amended on September 15, 2006, to add a claim alleging that the termination of her employment unlawfully interfered with her claim for ERISA–regulated benefits –*i.e.*, a retaliation claim under § 510. 29 U.S.C. § 1140. (Doc. # 3).  Defendant's answer includes a counterclaim against Plaintiff for overpayment of her regular salary in 2004.  (Doc. # 14).[1]

---

[1] On October 3, 2007, the parties jointly filed a factual stipulation stating their agreement that "the net amount due the defendant on the counterclaim is $3,138.94." (Doc. # 34).  Although the parties have agreed regarding the amount due on this counterclaim, the claim has not been settled. Rather, the court understands that the parties have agreed that any recovery obtained by Plaintiff in this case should be set-off by the stipulated amount owed to Defendant.

The parties' cross motions for summary judgment address only Plaintiff's ERISA benefits claims; neither party has requested summary judgment on Plaintiff's § 510 retaliation claim nor Defendant's counterclaim.  For the reasons set forth below, the court finds Plaintiff's Motion for Summary Judgment is due to be denied, and Defendant's Motion for Summary Judgment is due to be granted.[2]  Therefore, Plaintiff's ERISA benefit claims against Defendant will be dismissed. However, Plaintiff's § 510 retaliation claim and Defendant's counterclaim against Plaintiff for overpayment of her regular pay remain pending and will be set for pretrial and trial by separate orders.

## I.      Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are

---

[2] The court recognizes that portions of this opinion are substantially similar to the court's October 1, 2007 Memorandum Opinion granting summary judgment for BellSouth in the case of *Suzanne Lee v. BellSouth Telecommunications, Inc.* 2:06-cv-00380-RDP.  (Doc. # 23).  Although the facts of the two cases differ (as reflected in the respective opinions), the court's analysis of the applicable standard of review is the same.  Counsel for Plaintiff Lee and Defendant BellSouth in 2:06-cv-00380-RDP are the same counsel representing Plaintiff Gibbs and Defendant BellSouth in this case; therefore, their arguments regarding the applicable standard of review are the same in both cases.  Indeed, this court finds no appreciable difference in the analysis regarding which standard should be applied to review BellSouth's denial of benefits as to Plaintiff Lee and which standard should be applied to review BellSouth's denial of benefits as to Plaintiff Gibbs.  However, the similarity between that portion of the two opinions should not be viewed as the court's failure to recognize the differences between the claims asserted by Plaintiff Lee and those asserted by Plaintiff Gibbs in this case.  To the contrary, although the court ultimately reached the same decision in both cases - a determination that BellSouth did not act in an arbitrary or capricious manner when it denied benefits to either Plaintiff - it nonetheless conducted an independent analysis of each Plaintiff's claims, applying the regular arbitrary and capricious standard to the particular facts of each case.

resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative

evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial.  But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.    Relevant Undisputed Facts[3]

### A.    BellSouth's Disability Plans

Several BellSouth corporations, including BellSouth Telecommunications, Inc. ("BellSouth"), jointly sponsor and contribute to the BellSouth Corporation Representable Employees'

---

[3] If facts are in dispute, the court has noted the dispute, but will "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotations omitted).

Health Care Trust - Employees (the "Trust"), to provide health care and disability benefits to active BellSouth employees. (Avery Aff. at ¶ 4).[4]  The BellSouth Short Term Disability ("STD") and Long Term Disability ("LTD") Plans have consistently been treated by BellSouth as plans subject to ERISA. (Avery Aff. at ¶ 6). BellSouth has issued "summary plan descriptions" setting forth the terms of each plan, has maintained formal plan documents for each plan, has issued "Summary Annual Reports" describing the payments to and from the plans, filed annually Form 5500 for both plans. (Avery Aff. at ¶ 6). State Street Bank and Trust Company ("State Street"), a trust company independent of BellSouth, serves as Trustee. (Avery Aff. at ¶ 12). As Trustee, State Street is responsible for the management of Trust assets and has certain fiduciary responsibilities with respect to the Trust assets. (Avery Aff. at ¶ 12).

Prior to March 1, 2007, the independent third-party administrator for the STD and LTD Plans was Aetna, f/k/a Broadspire Services, Inc. ("Broadspire"), f/k/a Kemper National Services, Inc. ("Aetna"), an independent corporation headquartered in Connecticut. (Miller Dec. at ¶ 3). Aetna purchased the disability operations of Broadspire, the previous third-party administrator, on or about

---

[4] The court notes that the parties disagree about certain aspects of management of the Trust which Plaintiff claims demonstrate that the Trust is a mere illusion and that BellSouth actually controls the payment of claims. The court will not recount those disputes in detail here, however, because it finds that in light of the opinion in *Burroughs v. BellSouth Telecommunications, Inc.*, 2007 WL 1954050 (11th Cir. July 6, 2007), the parties' views on how the Trust is managed are simply not material to the court's analysis. (*See* discussion *infra* Section III.A.1). Plaintiff herself concedes that, with one non-material exception, the Trust at issue in this case is identical to the Trust employed by BellSouth in *Burroughs*. (Doc. # 32, at 18 n.1) (pointing out that the *only difference* between the LTD Plan in *Burroughs* and the STD Plan in this case is that with regard to the former, the Trust paid the beneficiaries directly whereas with respect to the latter, the Trust pays BellSouth)). Because the "illusionary trust" argument was rejected by the Eleventh Circuit in *Burroughs*, the court finds that the parties' disputes about the facts relevant to that argument are immaterial here.

April 1, 2006. (Stolarski Dec. at ¶ 3).[5]  While Aetna was the third-party claims administrator, it

reviewed and adjudicated all benefit claims submitted by BellSouth employees. (Stolarski Dec. at

¶ 6). BellSouth delegated to Aetna the exclusive discretionary authority to finally and conclusively

interpret and administer the terms of the short and long term disability plans offered to BellSouth

employees. (Miller Dec. at ¶ 6; Stolarski Dec. at ¶ 6).  Gibbs' claim was decided by Aetna in July

2006. (Stolarski Dec. at ¶ 8).

     Under the STD Plan, the term "disability" is defined as follows:

> A medical condition, which (i) makes a Participant unable to perform any type of
> work as a result of a physical or mental illness or an accidental injury or (ii) results
> in a Participant receiving treatment that qualifies as a Chemical Dependency
> Confinement.  "Any type of work" includes the Participant's regular job with or
> without accommodations, any other Participating Company job (regardless of
> availability) with or without accommodations, or temporary modified duties.  "A
> Participating Company job" is any job within a Participating Company or any job
> outside a Participating Company, which is comparable in skills and functions.  A
> "Chemical Dependency Confinement" means any period of continuous confinement
> for drug or alcohol dependency, which initially occurs on or after May 15, 2001 (or
> such confinement for which an appeal is pending and has not been ultimately
> determined in accordance with the claims and appeals provisions of the Plan) and

---

[5] The March 1, 2004 contract between BellSouth and Broadspire stated the following
information in Section 23:

> Where specific instructions as to a particular matter have been given, Broadspire is
> charged with strict compliance with such instructions, no matter how broad its
> general powers may otherwise have been.

> However, no provision of this Agreement shall permit, or be construed to permit
> BSC, its affiliates or any of their employees to provide instructions or direction to
> Broadspire in connection with Broadspire's approval or denial of claims for disability
> benefits under the respective plans.  Broadspire has sole and complete responsibility
> for determining whether a claimant is disabled under the terms of BSC's disability
> benefit plans, and discretionary authority to interpret or construe the plans to the
> extent necessary to determine a claimant's eligibility for benefits under the plans.

(Miller Dec. at ¶ 7).

> which is approved by or covered under the applicable BellSouth or Affiliate
> sponsored group health plan covering the Participant (or would be approved by or
> covered under such applicable group health plan if the Participant had not waived
> such coverage).   A Participant subject to a Disability is referred to as being
> "Disabled."

(Stolarski Dec. at ¶ 14; STD Plan at BST 0014).   Under the terms of the LTD Plan, only former

employees may receive LTD benefits.   (Avery Aff. at ¶ 14). LTD benefits are generally paid only to

those former employees who meet the definition of disability under the LTD Plan and who rarely

return to the active payroll.   (Avery Aff. at ¶ 14).

**B.      Gibbs' Medical Evidence of Disability**

On January 24, 2005, Dr. Kittinger examined Gibbs and reported that she suffered pain as

a result of a fall that injured her and also due to an earlier car accident.   (AR 172-73).   On January

27, 2005, MRIs showed Gibbs had right side herniation at C5-6; a "minimal" bulging disc at C4-5;

a small annular tear in the medline at L4-5 with no herniation; spondylolisthesis at L5-S1 with

bulging disc mostly to the left and bilateral foraminal stenosis; and hypertrophic degenerative

changes of the AC joint with impingement. (AR 178-81).   On January 31, 2005, Dr. Kittinger

examined Gibbs again and reported that she had almost fallen again and that she suffered continuing

problems including dizziness when standing, fatigue, and nausea.   (AR 174-75).

Dr. Kittinger referred Gibbs to Chandra Gehi, M.D. in early February 2005 for chronic neck

and back pain.   (AR 157).   Dr. Gehi examined Gibbs and reported:

> Her MRI of the lumbar spine was reviewed.   She has spondylolisthesis at L5-S1 with
> bulging disc mostly to the left and bilateral foraminal stenosis, annulus tear of the
> L4-L5 disc without herniation.   Her MRI of the right shoulder showed hypertrophic
> degenerate changes of the AC joints.   No rotator cuff tear.   MRI of the cervical area
> showed right sided herniation at C5-C6, bulging disc at C4-C5.   This patient has
> fibromyalgia, chronic pain syndrome and aggravation of her symptoms after a fall.
> I feel that clinical examination does not show any acute cord compression or any

motor sensory deficit.  There is a lot of pain.  We should try her on conservative treatment.  If she is not any better then she may require epidural injection in the neck. Right now the patient is interested to just control her pain.

(AR 158).  Thereafter, Dr. Kittinger examined Gibbs again and noted that she still was having problems from her fall including shoulder and neck and back pain, instability (balance), fatigue, nausea, and depression.  (AR 198-99).  Dr. Kittinger also reported that Gibbs suffered from migraines, insomnia, HTN, neck and back pain, and fibromyalgia.  (AR 176-77).  Dr. Gehi saw Gibbs again on February 16, 2005, and reported:

> Wt. 314 pounds. BP 164/100. Pulse 80.  She is alert and oriented.  She has multiple somatic symptoms and fibromyalgia symptoms as well as her knee is swollen.  I did not find any definite weakness or sensory deficit.  Rest of the examination does not show any change.
>
> This 47 year-old female has multiple aches and pains, disc disease, fibromyalgia and she perhaps has obstructive sleep apnea.  She is very much overweight that her pain will never get better.  No one would want to do surgery on her.

(AR 197).

On March 3, 2005, Dr. Kittinger reported having given Gibbs trigger point injections for lower back pain, and his examination found that Gibbs suffered from lower back pain, neck pain, fatigue, nausea, and continuing instability. (AR 205).  On March 10, 2005, Dr. David O'Neal summarized Gibbs' medical conditions:

> This is a 47-year-old female referred by Dr. Ronald Kittinger.  The patient has several symptoms.  She has some chronic problem with balance, headaches, light sensitivity, blurring of vision and some falls.  She fell in January.  She has chronic back pain for ten years and the fall seemed to aggravate that.  She has an automobile accident in February of 2004.  She has been off of work for sometime.  Sometimes stress will increase the pain.  She has had difficulty keeping food down because of general pain from Fibromyalgia and various arthritic conditions.  She has chronic poor sleep.  She has had some injections in her neck by Dr. Kittinger which helped. SHE has not had an orthopedic consultation.  MRI of the brain last year was negative. She had physical therapy but it did not seem to help.  No history of stroke.

8

> Medicines include Lortab, 3 a day, Zanaflex 4 to 6mg at night, Xanax 2mg at night,
> Effexor 150mg at night. Trazadone, Flexaril and Benicar.  She had MRI of the
> cervical spine in January that showed a right C5-6 disc herniation and a bulging disc
> at C4-5.  She also had hypertrophic degenerative changes in the ACT joint of the
> right shoulder.   Lumbar MRI shows spondylolisthesis at L5-S1 with a bulging disc
> mostly to the left and bilateral foraminal stenosis. She saw Dr. Gehi in Anniston who
> suggested surgery for her cervical disc.

(AR 209).  Dr. Kittinger examined Gibbs on March 17, 2005, March 31, 2005, April 7, 2005, and

April 28, 2005, and reported that she continued to suffer from pain, dizziness, very poor balance,

vision problems, another fall, and possibly passing out, although he noted that the trigger point

injections appeared to be helping with her pain. (AR 221-28).  On May 17, 2005, after examining

Plaintiff, Dr. Kittinger found that Gibbs' shoulder had worsened and she had suffered additional falls

with possible passing out, but he also noted some improvements. (AR 230-31).

On July 6, 2005, a Physical Capacity Evaluation was performed on Gibbs that showed the

following:  she could occasionally carry and lift up to 10 lbs; only her left arm could perform simple

grasping; she had no ability to repetitively push, pull, or use arm controls; she had no ability to

perform fine manipulation; only her right foot could repetitively use foot controls; she could

occasionally bend; she could never squat, crawl, climb, or reach; she had moderate restriction in

driving an automobile; and total restriction from unprotected heights, exposure to moving machinery,

exposure to changes in temperature, and exposure to dust, fumes or gases. (AR 238)  On that same

day, Dr. Kittinger performed a clinical assessment of pain finding that: (1) pain is present and found

to be intractably and virtually incapacitating; (2)  physical activity such as walking, standing, and

sitting, will increase the pain to such an extent that bed rest and/or medication is necessary; (3) pain

and/or prescribed medication render Gibbs totally restricted and thus unable to function at a

productive level of work; and (4) usual treatments for pain have had no appreciable effect or have

only briefly altered the level of pain.  (AR 239-40).  Dr. Kittinger further explained that, based on his

observations and treatment of Gibbs, she could be expected to miss in excess of 25-30 days per year

as a result of her underlying medical conditions, and her symptoms can reasonably be expected to

cause distraction from job tasks or result in failure to complete job tasks in a timely manner for a

total of at least one or more hours during a typical 8 hour work day. (AR 241).

On August 15, 2005, Gordon Kirschberg, M.D. reported the results of his Independent

Medical Examination ("IME") of Gibbs that was conducted at the request of Broadspire:

> This lady has chronic complaints of daily pain in a variety of locations without
> organic substrate for the perceived pain.  There are no neurological findings.
> Her neck and back examinations are discrepant.  She has superficial sensitivity to touch.
> No real decreased range of motion and discrepancy between straight leg raising,
> standing, and sitting.
>
> The patient has adopted a truly disabled role and it is going to be very difficult to
> change this.  Even the diagnosis of fibromyalgia which predates this accident is one
> which is debated in the literature as to whether or not it has an organic basis.
>
> In answer, specifically, to your questions there are no objective findings to support
> any impairment that would prevent this claimant from performing any occupation.
>
> The patient is not going to return to work without some major lifestyle changes and
> intensive behavior modification is the most important thing in changing this patient's
> symptoms and outlook.  If she has not yet been assessed by a behavioral psychologist
> or psychiatrist, that would be my suggestion in trying to get her back to a productive
> lifestyle.

(AR 247).

On September 2, 2005, Dr. O'Neal reported that Gibbs' condition was about the same as it

was in March 2005 (AR 218), and on September 8, 2005, Dr. O'Neal examined Gibbs in an office

visit:

> She is on Neurontin 300mg t.i.d. and tolerates it well.  She is on Mobic twice a day.
> She is in the process of applying for disability.  She has had migraine headaches for

years and when she fell in January striking the back of her head, her headaches increased along with some neck pain.  She has pain throughout her entire body constantly.  This includes headaches, neck pain, back pain, upper extremity pain, lower extremity pain, she has some trigger points in her shoulders.  She has had Lidocaine injections that were performed by Dr. Kittinger which helped temporarily. She has difficulty sitting for any length of time because of pain from pressure so she changes chairs or shifts, stands, etc.  States she can walk about 50 feet and then needs to sit down or her legs become weak.  She has not worked in the last eight or nine months because she feels too bad.  She has been depressed most of her adult life. She sees a psychiatrist today, Dr. Rena Bashir.  She has muscle spasms in her back, but Zanaflex helps.  She no longer uses Lortab.  She has not seen a rheumatologist in fifteen years since she was diagnosed with Fibromyalgia.  Her exam today is limited because of pain in various locations.  There is point tenderness to palpation in the neck, shoulders and lumbar paraspinal regions, left more than right.  Doubt there is much to offer this individual with generalized constant pain.  He will increase the nighttime Neurontin to 600mg to see if it offers any help for her headaches.  She certainly need psychiatric consultation which begins today.  She also will see a rheumatologist regarding the pain as well.  We will see here prn. DBO/dkt.

(AR 207).

On September 12, 2005, Dr. Kittinger sent a questionnaire back to Broadspire wherein he opined that Gibbs was "totally disabled," suffered multiple areas of chronic pain and fibromyalgia including lower back pain, cervical pain, shoulder pain, knee pain; had vision problems; had headaches; and had memory loss. (AR 432).  Dr. Kittinger also attached a list of medications and hand wrote on the list:  "All listed medications cause increased drowsiness, mental fog and may cause vision and judgment impairment.  All are necessary for patient to 'manage' at best, her conditions."  The medications included Lortab 3-4 times a day; Zanaflex 3-4 times a day; Promethazine 3 times a day; and T3 taken 2 times a day. (AR 434).

On September 21, 2005, Dr. Davis at Grayson and Associates prepared handwritten notes of Gibbs treatment and mental condition finding her depressed, frustrated at her inability to do anything, anxious, suffering chronic pain, severe mental problems, and he included the handwritten

number "50."  (AR 253-55).[6]   On September 28, 2005, Dr. O'Neal wrote a letter providing a summary of Gibbs' medical conditions:

> Ms. Cindy Gibbs is a patient with chronic pain syndrome.  Has been seen here for headaches which she has had for many years.  For these she takes Neurontin at a dose of 300mg in the morning, 300mg at noon and 600mg at night.  She is on various medications from her primary physician, Dr. Ron Kittinger.  She has a diagnosis established elsewhere of fibromyalgia and degenerative joint disease including the spine.  She as depression and sees a psychiatrist.  She has also been referred to a rheumatologist.  Her headaches are felt to be a strong component of the fibromyalgia, degenerative spine disease, accentuated by depression.

(AR 211).

On March 3, 2006, Dr. Kittinger wrote Broadspire opining that Gibbs is totally disabled.  He outlined:  (1) her cumulative musclutoskeletal injuries (falls and automobile accident) which rendered her homebound; (2) her ability to walk only with the assistance of a cane giving her significant fall potential anytime she moves about; (3) her significant balance problems; (4) her constant pain; and (5) her significant depression.  He noted that her pain does not improve with attempts at activity, and he stated that she suffers severe and recurrent pain in the neck, spine, mid to lower back and right knee, severe migraines and cluster headaches, depression and sleep deprivation.  He opined that her automobile accident and falls have fully and permanently exacerbated her fibromyalgia, degenerative joint and disc disease, and her chronic fatigue syndrome to the point where she has no hope of any normal life.  According to Dr. Kittinger, she will never be able to work again.  (AR 341-43).

---

[6] Plaintiff interprets the "50" to be a GAF score of 50, which according to the Diagnostic and Statistical Manual on Mental Disorders, 4th Ed. (DSM - IV), consists of serious symptoms or any serious impairment in social, occupational, or school functioning.

On May 19, 2006, Aetna received a fully favorable decision from the Social Security Administration determining Gibbs totally disabled beginning January 22, 2005 and continuing to the present (and future). (AR 679-88). The Administrative Law Judge stated:

> I have reviewed the claimant's subjective complaints in accordance with the guidelines provided by Social Security Regulations contained in 20 CFR 404.1529 and Social Security Ruling 96-7p. I have also taken into consideration the controlling case law in the Eleventh Circuit regarding the standard used to assess subjective complaints of pain and other subjective symptoms. This standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain." (citation omitted). This standard also applies to subjective symptoms other than pain. (citation omitted). I have carefully considered the claimant's allegations of functional limitations in light of these guidelines. Those allegations are supported by the objective medical evidence and treating sources' opinions and are found to be fully credible.

(AR 686).

## D.     Third-Party Administrator's Handling of the Claim

Gibbs was employed by BellSouth from October 9, 2000 through August 22, 2006. (BST 0110-11). Her first day absent was January 17, 2005, and the reasons for her absence were fibromyalgia, headaches, back and neck pain, cervical radiculopathy, asthma, insomnia, depression, peripheral neuropathy, chronic fatigue syndrome, and degenerative joint disease. (AR 14, 460-61; Stolarski Dec. at ¶18). Although Broadspire[7] representatives left messages for Gibbs on January 25, 26 and 31, 2005 (AR 159; Stolarski Dec. at ¶ 20), Gibbs informed Broadspire on January 31 that it was not to contact her and that any contact with her would be considered harassment. (AR 156; Stolarski Dec. at ¶ 21). Due to the fact that Gibbs failed to submit any medical information in support of her disability, did not provide the name of her treatment provider, and refused to

---

[7] At that time, Broadspire was BellSouth's third-party administrator.

13

communicate with Broadspire, her STD benefits were denied effective January 24, 2005.  (AR 13, 159-64; Stolarski Dec. at ¶ 22).  The STD denial was communicated to Gibbs via correspondence dated February 7, 2005.  (AR 159-64; Stolarski Dec. at ¶ 25).

Thereafter, on February 14, 2005, Broadspire received a facsimile containing medical information from Dr. Ronald Kittinger.  (AR 20-21, 170-181, 196; Stolarski Dec. at ¶ 27).  On February 24, 2005, Broadspire notified Gibbs that her medical records had been forwarded to the Appeals Department, but that without a formal appeal request they would not be reviewed.  (AR 200; Stolarski Dec. at ¶ 30).  The next day, Gibbs' attorney requested an appeal of the STD denial, copies of Broadspire's information relating to Ms. Gibbs, and asked that future correspondence to Gibbs be copied to his office.  (AR 201-03; Stolarski Dec. at ¶ 31).  After having submitted Gibbs' medical information to Broadspire for review over a period of almost five months, Gibbs' attorney notified Broadspire on July 8, 2005 that he had nothing further to submit.  (AR 322; Stolarski Dec. at ¶ 44).  However, Broadspire gave Gibbs until August 10, 2005 to submit medical information for review on appeal (AR 242; Stolarski Dec. at ¶ 46) and then extended that date at her attorney's request (AR 252, 259, 284-85; Stolarski Dec. at ¶ 57, 64).  Broadspire also engaged numerous physicians to perform Peer Reviews during the period from August to November 2005.  (AR 249-51; AR262-83).  On November 28, 2005, Broadspire denied Gibbs' first level appeal.  (AR 286-89).

On January 13, 2006, Gibbs requested a second level appeal.  (AR 303-04; Stolarski Dec. at ¶ 71).  After receiving additional medical information from Gibbs and after conducting additional Peer Reviews, Aetna[8] denied Gibbs' second and final level appeal on July 21, 2006.  (AR 454-58).

---

[8] As noted earlier, Aetna purchased the disability operations of Broadspire on or about April 1, 2006.  (Stolarski Dec. at ¶ 3).

### 1.    Peer Reviews by Broadspire

From August to November 2005, Broadspire submitted medical information to physicians for Peer Reviews related to her first level appeal. (AR 249-51; AR262-83).  None of the Peer Review physicians examined Gibbs.  (AR 249, 262, 266, 270, 275, 279-80, 356).  Specifically, the following Peer Reviews were performed:  (1) Dr. Vaughn Cohan performed a Peer Review of the IME Report on September 1, 2005  (AR 353-55; Stolarski Dec. at ¶ 51); (2) Dr. Wendy Weinstein (internal medicine) performed a Peer Review of Gibbs' entire file on October 19, 2005, (AR 262-65; Stolarski Dec. at ¶ 58); (3) Dr. Yvonne Sherrer (rheumatology) performed a Peer Review of Gibbs' entire file on November 2, 2005  (AR 356-59; Stolarski Dec. at ¶ 60); (4) Dr. Joseph Cimino (psychology) performed a Peer Review of Gibbs' entire file on November 2, 2005;  (AR 270-73; Stolarski Dec. at ¶ 61); (5) Dr. Gerald Goldberg (neurology) performed a Peer Review of Gibbs' entire file on November 15, 2005 (AR 266-69; Stolarski Dec. at ¶ 62); (6) Dr. Yvonne Sherrer (rheumatology) performed a Peer Review of Gibbs' entire file on November 23, 2005  (AR 279-82; Stolarski Dec. at ¶ 65); and (7) Dr. Ross Clark (ENT) performed a Peer Review of Gibbs' entire file on November 23, 2005 (AR 275-77; Stolarski Dec. at ¶ 66).

All of the physicians noted that "based on the documentation, job description, and peer to peer (when applicable), [] the information [does] support a functional impairment from (giving specified dates)." (AR 249, 263, 267, 271, 276, and 280).  However, all of the physicians also noted that Gibbs' medical information "fails to support impairment for entire time frame." (AR 249, 263, 267, 271, 276, and 280).  One of the physicians noted that "based on the provided medical records there are no specific restrictions or limitations that have been documented.  The claimant has

15

subjective complaints of pain and fatigue but no indication of significantly abnormal physical examinations findings that would cause any specific restrictions or limitations."  (AR 264).

Most of the Peer Review physicians noted that Gibbs' subjective complaints [would] preclude her ability to work (AR 263, 267, 271, 276, 280), while three physicians noted that Gibbs' pain complaints were not of a degree that would preclude work (AR 264, 277), or were not substantiated by examination findings.  (AR 273).  One physician noted:  "It is my opinion that the documentation submitted fails to demonstrate objective evidence of a functional impairment which would have precluded the claimant from performing 'any occupation' from 1-24-2005 to the present."  (AR 250).

After Gibbs' initiated her January 2006 second level appeal, Broadspire arranged for additional peer consultants to contact and speak with Gibbs' treatment provider.  (AR 348; Stolarski Dec. at ¶ 81).  On May 30, 2006, Dr. Jakob Ulfarrson (rheumatology) performed a Peer Review of Gibbs' entire file and found that the information submitted failed to support impairment.  (AR 361-63; Stolarski Dec. at ¶ 83).  Dr. Russell Superfine (internal medicine/emergency medicine) performed a Peer Review relating to the diagnoses associated with Gibbs on June 1, 2006, and found that the information failed to support impairment.  (AR 365-68; Stolarski Dec. at ¶ 85).  In order to clarify Gibbs' condition and functional abilities, Dr. Superfine made several attempts to contact Dr. Kittinger.  (AR 367; Stolarski Dec. at ¶ 86).  Dr. Kittinger eventually returned Dr. Superfine's call on June 6, 2006, and Dr. Superfine prepared an addendum to his June 1, 2006 Peer Review based on his discussions with Dr. Kittinger.  (AR 369-71; Stolarski Dec. at ¶ 87, 88). Dr. Leonard Schnurr (psychology) performed a Peer Review of Ms. Gibbs' entire file on June 30, 2006, and found that the information failed to support impairment.  (AR 372-75; Stolarski Dec. at ¶ 91).

16

As before, all of the Peer Reviewers examined only records and never conducted an examination of Gibbs.  (AR 361-62, 365-66, 370, and 372-73).  One reviewer, after admitting Gibbs suffered the medical problems and diagnosis listed by her physicians, stated: "There are insufficient physical and diagnostic findings to support a level of functional impairment, which would preclude the claimant from performing the duties of any occupation from 1/24/05 through the present." (AR 368, 371).  Another reviewer agreed that Dr. Kittinger's restrictions–including no lifting or carrying more than 10 pounds, no repetitive pushing or pulling, and no squatting, crouching, crawling, or climbing–were likely permanent. (AR 363). Although a reviewer previously determined that no restrictions or limitations were necessary, he altered his analysis in his second Peer Review to find that Gibbs was restricted to a sedentary demand position. (*Compare* AR 368 *with* AR371). The remaining reviewer determined that no restrictions were recommended from a psychological standpoint. (AR 375).

With respect to the impact of Gibbs' medications on her ability to work, one Peer Reviewer was unable to determine the impact while the other two reviewers found no medications that would affect Gibbs' ability to work.  (AR 363, 368, 371, 375).  As to subjective complaints of pain, one reviewer noted that Gibbs' pain complaints were not of a degree that would preclude work (AR 363), while another reviewer noted that her complaints were not substantiated by examination findings. (AR 375).  Accordingly, two of the reviewers stated that Gibbs' subjective complaints would not preclude her ability to work (AR 363, 368, 371), while the remaining reviewer stated that Gibbs' subjective emotional stress, while present, was not substantiated by examination findings.  (AR 375).

At least two of the reviewers noted that additional evidence would have been helpful in evaluating Gibbs' claim.  (AR 362, 366, 370,  373).  Nonetheless, there is no evidence that

Broadspire or Aetna attempted to have this additional information available in the form of another IME or otherwise, nor did Broadspire or Aetna inform Gibbs that such information would be helpful so she could attempt to obtain such information.

### 2. Independent Medical Examination by Broadspire

Broadspire made arrangements for Ms. Gibbs to participate in an IME on August 15, 2005. (AR 244; Stolarski Dec. at ¶ 47). Dr. Kirschberg's IME report from August 15, 2005 indicated, among other items, that Ms. Gibbs was oriented as to time, place and person, could move her neck pretty normally, could perform straight leg raising sitting up to 90º, received a 5/5 rating in upper and lower extremity strength, and he noted there were no objective findings to support any impairment that would prevent Gibbs from performing any occupation. (AR 428-31; Stolarski Dec. at ¶ 48). In addition, Dr. Kirschberg stated that although she could move her neck pretty normally, if he touched her neck or very low back, even very superficially, she would wince as if in tremendous pain and assured him that she would get nauseated and vomit if he kept touching those areas. (AR 429; Stolarski Dec. at ¶ 49). Lastly, it was Dr. Kirschberg's opinion that Ms. Gibbs had adopted a truly disabled role and that it would be very difficult to change her perception. (AR 430; Stolarski Dec. at ¶ 50).

### III.   DISCUSSION

#### A.   Denial of Short-Term Disability Benefits

Plaintiff's claim for disability benefits is governed by 29 U.S.C. § 1132(a), which allows a civil action to be brought by a participant or beneficiary "to recover benefits due to h[er] under the terms of h[er] plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Here, Aetna, the third-party

administrator to whom BellSouth delegated the exclusive discretionary authority to finally and conclusively interpret and administer the terms of the short and long term disability plans offered to its employees, denied Gibbs' claim in July 2006.  (Miller Dec. at ¶ 6; Stolarski Dec. at ¶ 6, 8).

The statutory language of ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989); *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003); *Marecek v. BellSouth Telecomms., Inc.*, 49 F.3d 702, 705 (11th Cir. 1995).  However, our Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion, (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir. 1997).[9]  In *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), the Eleventh Circuit recapitulated the multi-step approach to be utilized in judicially reviewing almost all ERISA plan benefit denials:

(1)     Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)     If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)     If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

---

[9] This Circuit has applied the three levels of review to both plan interpretations and factual determinations.  *See Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir. 2003).

(4)     If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.* at 1138.

Thus, the first step for this court in analyzing Plaintiff's claim is to determine whether Aetna was "wrong" in denying Plaintiff's claim for short-term disability benefits**.** The reasons for the denial of Gibbs' claim for short-term disability benefits are set forth in detail in the final denial letter dated July 21, 2006 from Nadine Stolarski, Appeal Coordinator, to Gibbs' attorney. (AR 459-63). The letter indicates that all of the medical information submitted by Gibbs was reviewed and considered, peer reviews were conducted by specialists in the areas of internal medicine, ear, nose and throat, psychology, rheumatology, neurology, and psychiatry, and an IME was performed by Dr. Kirschberg who specializes in neurology. (AR 459-63). In this case, in order to give Plaintiff the benefit of the doubt, the court will assume, without deciding, that Aetna's decision to deny her STD benefits was wrong.

**1.     Determination of Which Standard of Review Applies to the Decision**

The court's analysis, therefore, turns to the appropriate standard of review to be applied in this case. Here, it is undisputed that the STD Plan at issue expressly grants "discretion" to Aetna as Plan Administrator. (Miller Dec. at ¶ 6; Stolarski Dec. at ¶ 6).[10] Thus, it is clear that a *de novo*

---

[10] Section 6.6 of BellSouth's STD Plan expressly states:

Final Authority. The EBCRC (and its delegates) has complete discretionary authority to determine Benefits and to interpret the terms and provisions of the Plan. Such determinations and interpretations shall be final and conclusive.

standard does not apply to the decision to deny Plaintiff's claim for benefits. The parties dispute, however, whether the appropriate standard to be applied is the *regular* arbitrary and capricious standard that is akin to an abuse of discretion review, or whether the *heightened* arbitrary and capricious standard applicable to conflicted fiduciaries governs the decisions in this case.

Plaintiff relies on the Eleventh Circuit's decision in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), and contends that, even though BellSouth employed Aetna as its claims administrator with the authority to make decisions regarding benefit claims, the taint of self-interest still infected the decision here and thus requires the application of the heightened arbitrary and capricious standard. In *Williams*, the court considered whether the employment of a separate "claims administrator" to process and decide claims that were then paid by the company (who retained the "plan administrator" title) resolved the conflict.[11] *Williams*, 373 F.3d at 1136-37. The court found that based upon the facts in *Williams*, despite the employment of

_____

(BellSouth STD Plan at p. 9; BST 0012). The Summary Plan Description for the STD Plan states:

> NOTE:   Effective September 3, 1996, the BellSouth Telecommunications Employees' Benefit Claim Review Committee has delegated to Kemper National Services the duty to administer all claims for plan benefits for BellSouth Telecommunications, Inc. and BellSouth Business Systems, Inc. plan participants. Kemper is the named fiduciary under the plan with complete authority to review all denied claims for benefits in exercising such fiduciary responsibilities. Kemper shall have discretionary authority to determine whether or to what extent participants are eligible for benefits and to construe disputed or doubtful plan terms. Kemper shall be deemed to have properly exercised such authority unless they have abused their discretion hereunder by acting as arbitrarily and capriciously.

(STD SPD; BST 0027).

[11] Prior to *Williams*, this Circuit had made clear that when a company both administers and funds a plan, a conflict of interest arises, thus triggering heightened arbitrary and capricious review. *See Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1562 (11th Cir. 1990).

a separate claims administrator, "BellSouth nevertheless holds the ultimate power to do with claims

as it wants; it just has to tell [the claims administrator] when to do it."  *Williams*, 373 F.3d at

1136-37.[12]  As a result, the Eleventh Circuit concluded that "the conflict between BellSouth's

fiduciary and profit-making interest, which triggers the heightened standard of review, remains."

*Williams*, 373 F.3d at 1136-37. Plaintiff claims that, in this case, the denial of Plaintiff's STD claim

saved BellSouth $26,715.00 in STD Plan benefits,[13] and, therefore, BellSouth directly profited from

the denial of benefits and a conflict of interest exists.  Accordingly, "[t]he [conflicted] fiduciary ...

should bear the burden of dispelling the notion that its conflict of interest has tainted its judgment."

*Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1568 (11th Cir. 1990).

In response, BellSouth argues that its use of the Trust from which disability benefits are paid

distinguishes this case from *Williams*[14] and negates any other argument that Aetna was under any

---

[12] The contract between BellSouth and the claims administrator provided that "where specific instructions as to a particular matter have been given [by BellSouth], [the claims administrator] is charged with strict compliance with such instructions, no matter how broad its general powers may otherwise have been."  *Williams*, 373 F.3d at 1136.

[13] BellSouth disputes this assertion.

[14] Defendant also distinguishes *Williams* by pointing out that the contractual language relied upon by the Eleventh Circuit in the *Williams* case is no longer contained in the contract between BellSouth and its third-party administrator. Specifically, the contract was amended to provide as follows:

> However, no provision of this Agreement shall permit, or be construed to permit BSC, its affiliates or any of their employees to provide instructions or direction to Broadspire in connection with Broadspire's approval or denial of claims for disability benefits under the respective plans.  Broadspire has sole and complete responsibility for determining whether a claimant is disabled under the terms of BSC's disability benefit plans, and discretionary authority to interpret or construe the plans to the extent necessary to determine a claimant's eligibility for benefits under the plans.

(Miller Dec. at ¶ 7 and Ex. A thereto).

conflict of interest which would necessitate a "heightened" arbitrary and capricious standard of review. (Doc. # 27, at 14-15).[15] As the court noted in *Brown*, "[t]he burden of demonstrating the reasons for a challenged plan interpretation will, by and large, draw a distinction between plans that are truly trusts and plans that are based solely on contracts or policies for insurance. Decisions on behalf of a plan in the form of a trust lend themselves less readily to the accusation of conflicting interests and are more easily justified." *Brown*, 898 F.2d at 1567. Thus, "[t]hat plan administrators' decisions have had a favorable impact on the balance sheet of the trust itself, however, suggests no 'conflict of interest.'" *Brown*, 898 F.2d at 1567-68.

Plaintiff counters by claiming that the Trust is nothing more than an illusion or pass-through that does not insulate BellSouth from the taint of self-interest. Unfortunately for Plaintiff, the recent decision of *Burroughs v. BellSouth Telecommunications, Inc.*, 2007 WL 1954050 (11th Cir. July 6, 2007), which was issued after the parties submitted their summary judgment materials in this case, flies in the face of that analysis and squarely rejects the district court's application of a heightened arbitrary and capricious standard based upon the very arguments made by Plaintiff here. In *Burroughs*, the district court applied the heightened standard to a benefits decision made by BellSouth and Broadspire because it concluded that "no matter what entities in addition to [BellSouth] contributed to [BellSouth]'s denial decision and were interposed by [BellSouth] as

---

[15] The parties in this case dispute whether evidence of a trust was submitted to the *Williams* court. Nevertheless, it is clear that the *Williams* opinion does not rely on any evidence of a trust, and indeed notes to the contrary:

> BellSouth's disability plan is not a trust or otherwise self funded. Rather, any benefits are paid directly out of BellSouth's operating expenses. It is therefore, not in BellSouth's *financial* interest to approve disability benefit claims.

*Williams*, 373 F.3d at 1135, n. 4.

insulators [through the trust vehicle], [BellSouth] was the actual decision-maker and was operating under a conflict-of- interest." *Burroughs v. BellSouth Tele., Inc.*, N.D. Ala. CV-01-AR-1863-M (July 21, 2006) (Doc. # 16, Ex. 13, at 10).[16]   The Eleventh Circuit disagreed with the district court's analysis, and issued the following pithy holding which explicitly rejects the application of the heightened standard in that case and implicitly rejects the conclusion that the Trust employed by BellSouth to pay its claims is nothing more than a fiction:

> The 2002 documents for the Plan state the claims administrator has exclusive, final, discretionary authority to interpret the Plan and determine benefits. Under these circumstances, the proper standard of review for the benefits decision is arbitrary and capricious. *See Buckley*, 115 F.3d at 939. We have determined the district court applied the incorrect standard of review to the claims administrator's decision.

---

[16] Although the district court in *Burroughs* did not go to great lengths to explain the facts surrounding the trust in that case, it adopted the analysis outlined in *Carter v. BellSouth Telecommunications, Inc.*, 345 F.Supp. 2d 1296 (N.D. Ala. 2004) (which was vacated on the joint motion of the parties as part of a settlement reached during the pendency of appeal) which found, in pertinent part:

> The LTD plan is funded by contributions from BST and other BellSouth affiliates to a so-called irrevocable trust as to which State Street Bank is "trustee." . . . The "trust" exists only for the mechanical purpose of making payments to plan participants in the various employee benefit plans, including the LTD plan here involved. It is like a simple checking account replenished by the depositor just before it is overdrawn. It is an elaborate illusion. When Kemper [now Broadspire], the claims administrator, approves an application for benefits, an authorization of payment is sent to State Street Bank which routinely sends the payment to the beneficiary. State Street Bank exercises no discretion whatsoever. It cannot and does not employ independent judgment of the sort that a real trustee would employ. Its role is simply to follow the direction it receives and to disburse accordingly. The trust agreement expressly provides that State Street Bank can only "make such payment as BellSouth directs." ... Not only is the transparency of the "trust" now obvious to the court, but there is additional evidence that ultimately persuades the court. ... It is apparent not only from the paper trail but from what Ms. Miller said in her affidavit that any payment of benefits can adversely affect BST's bottom line.

*Carter*, 345 F.Supp.2d at 1298-99.

*Burroughs*, 2007 WL 1954050, at *1.

This court cannot in any principled manner distinguish *Burroughs* from the facts of this case. In a turn of cruel irony, Plaintiff's summary judgment submissions in this case rely heavily on the now-vacated district court opinion in *Burroughs* (Docs. # 32, 33), pointing out that the *only difference* between the LTD Plan in *Burroughs* and *Carter* and the STD Plan in this case is that with regard to the former, the Trust paid the beneficiaries directly whereas with respect to the latter, the Trust pays BellSouth.  (Doc. # 32, at 18 n.1).  Plaintiff argues that "[t]he *Burroughs* [district court] opinion is precedent in this district and Gibbs respectfully suggests that the court should be consistent and follow *Burroughs* in its *Carter*-based analysis of the effect of the 'trust' on benefit payments."  (Doc. # 32, at 17).  Unfortunately for Plaintiff, the similarities between the facts of this case and the facts of *Burroughs* (that previously–*i.e.*, before the Eleventh Circuit reversed the district court–she pointed out and championed as part of her arguments here) now inure to her detriment. Although *Burroughs* was not selected for publication and thus is not binding precedent, it is nonetheless persuasive reasoning that leads this court to reject Plaintiff's attempt to use evidence regarding the nature of the Trust to show that a conflict of interest exists in this case. *See* Eleventh Circuit Rule 36-2.  Accordingly, this court concludes that the heightened arbitrary and capricious standard does not apply here.  Instead, the court will review the decision in this case pursuant to the *regular* arbitrary and capricious standard that is akin to an abuse of discretion review.

### 2.      Application of the Standard

In applying the arbitrary and capricious standard, "this Court's role is limited to determining whether [Aetna's] interpretation was made rationally and in good faith—not whether it was right." *Guy v. Southeastern Iron Workers Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989).  Aetna's decision

to deny Plaintiff's claim for STD benefits may be reversed only if the decision is "completely unreasonable." *Sclafani v. Central States Pension Fund*, 795 F. Supp. 400, 402 (S.D. Fla. 1992), *aff'd without op.*, 998 F.2d 1021 (11th Cir. 1993). The determination of the plan administrator "need not be the best possible decision only one with a rational justification." *Griffis v. Delta Family-Care Disability Plan*, 723 F.2d 822, 825 (11th Cir. 1984).

If a reasonable basis exists for the decision made by Aetna, "it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *Jett v. Blue Cross & Blue Shield, Inc.*, 890 F.2d 1137, 1138 (11th Cir. 1989); *see also Sharron v. Amalgamated Ins. Agency Servs., Inc.*, 704 F.2d 562, 564 (11th Cir. 1983) ("a court should enforce a decision of pension fund trustees even though the court may disagree with it, so long as the decision is not arbitrary and capricious"). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Retirement Plans*, 887 F.2d 689, 693 (6th Cir. 1989), quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985).

Here, as noted earlier, the reasons for the denial of Gibbs' claim for short-term disability benefits are set forth in detail in the final denial letter dated July 21, 2006 from Nadine Stolarski, Appeal Coordinator, to Gibbs' attorney. (AR 459). The letter indicates that all of the medical information submitted by Gibbs was reviewed and considered, peer reviews were conducted by specialists in the areas of internal medicine, ear, nose and throat, psychology, rheumatology, neurology, and psychiatry, and an IME was performed by Dr. Kirschberg who specializes in neurology. (AR 459-63).

26

Although the Appeals Committee noted Dr. Kittinger's opinion that Gibbs was incapable of performing any occupation, it found that the data submitted "does not support the inability to perform any or all types of work, particularly sedentary type work, with or without appropriate accommodations." (AR 461).  The Appeals Committee noted that a peer consultant (Dr. Superfine) contacted Dr. Kittinger to speak with him about Gibbs' treatment.  (AR 459).  Moreover, the Appeals Committee relied on the results of Dr. Kirschberg's IME of Gibbs, which found no psychological examination findings, no indication of side effects from her medication regimen, unremarkable mental status examination, and "no objective examination findings to support impairment that would prevent Ms. Gibbs from performing work of any occupation."  (AR 461).

The court finds that based on the information obtained during Aetna's thorough analysis of Gibbs' claim, as set forth above, Aetna acted reasonably when it denied Gibbs' claim for STD benefits and its decision, therefore, should be upheld under the regular arbitrary and capricious standard.  In so finding, the court rejects Plaintiff's contentions that the following evidence suggests that Aetna's decision was "completely unreasonable:" (1) the Peer Reviews conducted by a physicians retained by Aetna improperly dismissed the personal observations of unbiased witnesses (her treating physicians);[17] (2) Aetna allegedly considered only her functional capacity and not her allegations of pain;[18] (3) the Peer Reviews relied on functional capacity criteria to determine

_____

[17] Defendant notes that reliance on a Peer Review–as opposed to an IME– is not unreasonable because, pursuant to *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), opinions of treating physicians in the ERISA context are not entitled to any greater deference than those of reviewing physicians.

[18] To the contrary, as outlined in the Appeals Committee denial letter of July 21, 2006, and as evidenced by the numerous Peer Review reports and the IME, Gibbs' allegations of pain were identified both by the doctors who examined her and those who reviewed her file.  Nonetheless, all of the Peer Review physicians found that her pain was not of a degree that would preclude work (AR

benefits;[19] (4)  Dr. Kirschberg's IME is not reliable;[20] and (5) the fully favorable Social Security

decision finding Gibbs totally disabled for the entire relevant time frame is highly persuasive.[21]

Accordingly, the court finds that Defendant's decision to deny Plaintiff's STD benefits is due

to be upheld as reasonable and, therefore, Defendant's motion for summary judgment on this claim

is due to be granted.

---

363), not substantiated by examination findings (AR 375), or generally not significant enough to warrant a finding of impairment for the entire relevant time period.

[19] In support of this argument, Plaintiff principally relies on Judge Blackburn's opinion in *Hammock v. BellSouth Tele., Inc.*, N.D. Ala CV04-B-2318-S, which found: "Plaintiff has made no claim that she does not have the physical functional capacity to perform sedentary work. Her STD claim is based on her headache pain. Therefore, whether she can physically sit, stand, lift, and carry is irrelevant to the determination of whether she is disabled due to headaches. A finding that plaintiff is not disabled because she has the physical functional capacity to perform sedentary work is arbitrary and capricious." *Hammock* (Mar 31, 2006 Opinion p. 19). Judge Blackburn specifically noted in *Hammock* that the Plan at issue in that case did not require objective medical evidence of disability. *Hammock*, Mar 31, 2006 p. 19 ("As set forth above, the Plan does not require objective evidence of inability to work . . . .Therefore, rejection of plaintiff's claim because the Plan requires objective evidence was arbitrary and capricious."). *Hammock* is not binding on this court but, even more importantly, the facts in this case differ from *Hammock*.

[20] Plaintiff asserts that Dr. Kirschberg's IME should be discounted by the court because: (1) he "does not have sufficient expertise in fibromyalgia;" (2) he failed to observe or test for "proper things;" (3) he sought merely "to comply with Broadspire's instructions to generate a 'not disabled' report;" and (4) he was biased against Plaintiff.  Plaintiff's assertions are just that - assertions without any citation to, or basis in, the evidence.

[21] Although the Social Security decision was rendered prior to Aetna's decision and properly can be *considered* by the court, *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994), it "is not *dispositive* of the issue before [the court], particularly given the measure of deference that we afford a plan administrator's decision," *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997) (emphasis added).  This court cannot conclude under the arbitrary and capricious standard of review that it was entirely unreasonable for Aetna to reach a different decision than the Social Security Administration.

### B.    Denial of Long-Term Disability Benefits

Given the court's decision to grant summary judgment on Plaintiff's claim for STD benefits, summary judgment is also appropriate on Plaintiff's claim for LTD benefits.  Plaintiff does not dispute that to even be eligible for an award of LTD benefits under BellSouth's Plan, STD Plan benefits must have been approved and all 52 weeks of STD Plan benefits must have been received. (Doc. # 31, at 9) ("BellSouth correctly points out that Ms. Gibbs must receive STD Plan benefits for all 52 weeks in order th [sic] receive LTD Plan benefits").  Thus, Aetna will not even process a claim for LTD benefits unless all 52 weeks of STD Plan benefits have been exhausted.  As Plaintiff concedes, "the appropriate action is for the court to award LTD benefits if the plaintiff prevails on the STD claim and to not award LTD Plan benefits if the plaintiff does not prevail on the STD claim." (Doc. # 24, at 29). Therefore, the court does not reach the merits of Plaintiff's LTD benefits claim.[22]

### IV.    CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment is due to be denied and Defendant's Motion for Summary Judgment is due to be granted.  Plaintiff's remaining

---

[22] The court also need not consider Plaintiff's collateral estoppel argument regarding exhaustion of administrative remedies regarding her LTD claim. Plaintiff argues in her initial brief that based upon *Brewer v. BellSouth Tele., Inc.,* No 02-11159 (11th Cir. Mar. 12, 2003)- in which the Eleventh Circuit found that Judge Acker did not abuse his discretion in choosing not to apply the exhaustion requirement to plaintiff's LTD benefits claim because exhaustion would have been futile given that any award of LTD benefits was contingent upon the receipt of STD benefits - BellSouth should be collaterally estopped from arguing that Plaintiff failed to exhaust her administrative remedies regarding her claim for LTD benefits in this case.  (Doc. # 24, at 28-29). Even assuming that Plaintiff is relieved of her exhaustion requirement as to her LTD benefits claim, LTD benefits are still not due to be awarded because the court has concluded that the denial of her STD benefits claim should be upheld.

§ 510 retaliation claim and Defendant's counterclaim regarding overpayment of wages will be set for pretrial and trial.  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____19th_____ day of October, 2007.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE